Case number 2012-6258, 2012-6341, Mark Emkes in his official capacity of Commissioner of the Tennessee Department of Finance and Administration, et al. v. People First of Tennessee, not to exceed 50 minutes each side, Mr. Kirk for the appellate. Thank you, Judge Rogers, and may it please the Court. Michael Kirk on behalf of the State of Tennessee. The District Court awarded the plaintiffs over $550,000 in attorney's fees and expenses, largely for work done on contempt proceedings in 2008 and 2009. The State vigorously contested all of the allegations in the contempt motion, and the Court made no findings on any of the contempt allegations, and certainly no findings that the State had violated any of the remedial orders or the 2006 settlement agreement as alleged in the contempt motion. And the District Court did not grant the contempt motion or order any other relief. Instead, the Court suspended the contempt proceedings in the summer of 2009 and subsequently entered an order striking the motion from the docket without prejudice. People First has never renewed its motion. Nevertheless, the Court below held that the People First had prevailed, and it did so on the basis of two agreed orders that were entered two years after the completion of the contempt proceedings that provided for the disposition of fine monies that had been held in the registry of the Court. As a result of contempt findings back in the late 1990s, there was over $4.5 million sitting in the registry of the Court. And in 2011, as the case was winding toward its completion, the three parties in the case, the United States, the State, and People First, all recognized that if the case ended with this money sitting in the clerk's registry, it would flow to the United States Treasury. And none of the parties wanted to see that happen, so they agreed to these two orders that provided for the disposition of these monies. Neither order said anything at all about the two years ago contempt motion. The contempt motion had sought an injunction prohibiting the State from taking certain actions, and it had sought an order requiring the State to compensate individual class members. These agreed-upon fine money orders did not enter any injunction against the State, and did not require the State to compensate the class members. The fine orders have got to be tied to plaintiff's initial success on the merits, correct? Yes, Your Honor. Comment on that. I'd be happy to. And sort of the bucket I would put that into from the bin-to-bee case is, the Court clearly held that the orders must result from the work done. There is nothing in the record of this case that suggests that either of those fine monies resulted from the work done two years earlier in the contempt motion. Well, I mean, let me just ask you about that. I mean, I understand your argument. It's kind of a causation argument. But I wonder if at least one can discern a relationship between certain allegations in the contempt motion and these two orders. Specifically, the contempt motion, as I understand it, talks about a lack, complained about a lack of a written policy regarding subsidies, and that that would present a risk that, I guess, the people who are moving out of the facility would be able to get adequate housing, number one. And number two, they talked about or complained about this old tool, you know, not necessarily providing necessary services. And why isn't there at least a logical relationship, if not necessarily a causal one, between those two allegations, at least, and these two orders? Judge Kaslitz, let me take them one at a time. But before I do, I want to make an overarching point. Okay. The clear inquiry here is whether the work done on the contempt motion resulted in the two years later order. And you have identified at a very high level of generality, and obviously we discussed this in our briefs, the only conceivable connection with regard to each order. First, the housing. The allegation in the contempt motion, and it was, you know, a one-sentence passing allegation, was that the state doesn't have an adequate policy, and that might lead to somehow depriving them of subsidies, even though there was no allegation that they were being deprived of subsidies. The order, the fine money order, had nothing to do with ordering the state to issue a written policy. It had nothing to do with the subsidies that the state was providing for rental housing for these class members. There is a connection at the level of housing only in this sense. The order required that the money go to this independent, non-profit housing foundation for use to purchase housing stock. And you could argue that that provides a benefit, and the stock would be not just for class members, but anybody in West Tennessee with developmentally disabled disabilities. And so you could say that there is a connection only at the highest level of generality and that both related to housing. And if there's any doubt on this point, if I could finish the point, Your Honor, I would urge the court to look at the overarching order governing use of the fine monies. Because that, in no uncertain terms, prohibits the use of those monies to carry out any of the state's obligations under the remedial order. The state had no obligation under any remedial order to create this housing foundation or to assist in the purchase of housing stock. So I don't see how it could in any way relate to the underlying relief. Similar point with regard to the assessment tool. There was nothing in the original orders that said anything at all about assessment tools. In the contempt motion, they did complain about the scoring on this tool. The agreed-upon order disposing of the fine money did nothing with the scoring on the tool. Instead, what it said is, all the parties agree, we want a new tool. So again, can I say that at a high level of generality, there's absolutely no relation? No. But I would submit that the relation is so general, and when you look at all the other evidence in the record, the fact that the contempt motions were not released, I mean, think about that for a moment. Their theory of the case is that, but for all the work they'd done on these contempt motions, we would never have agreed to these orders allowing millions of dollars to flow to us. That makes no sense as a matter of common sense. Is it really a but-for causation test? I mean, the results in? If anything, I think it's harder than that. I think it's a proximate cause test. I mean, the court used the word resulted in, and in most cases, it's going to be plain on the record because in most cases, the subsequent order is going to say, we resolved the contempt motion by providing this relief, and you're released. Think about the situation here, though. Supposedly, we entered these agreed orders to get out from underneath these contempt motions, yet there's no mention of them and no release. The next day after those orders were entered, they could have turned around and refiled their contempt motion, and we would have had to defend it on the merits. Your Honor, the resulted in is only one of four grounds that I have for across-the-board reversal, and I've got a fifth for vacature of 90% of the order, so let me turn to my other three. Under the Binta B test, the first thing you're supposed to look at is, was the work necessary to enforce any order of the court on the merits? Neither the district court nor the plaintiffs in any of their briefing in this court have ever identified any provision of any merits order that was being enforced by that contempt procedure. Well, I mean, Binta B came down after the district court's decision, so it's understandable the court didn't speak in those terms. It is, Your Honor. I mean, if the court hasn't addressed it, is that a reason simply to vacate rather than reverse? I would respectfully submit, Judge Kethledge, that it's not. That reversal is required here, and let me give you three reasons for that. Reason number one, that's not what Binta B did. Binta B didn't say, we've got this new test. District court, you didn't apply it. We'll send it back. You apply it. And in the course of the opinion, the court emphasized the importance of not letting these attorneys' fees disputes explode into a lot of satellite collateral litigation, and I think that was part of what drove the court to not simply announce the test but to actually apply it where it could. Now, it sent it back when there were places where there were questions of fact that hadn't been resolved, but the court went through, you know, in a lengthy opinion, different categories of fees being claimed and applied its test. I'm asking you to do the same thing here. Point number two, there are no questions of fact. You can decide this on the record you have before you. Just as Binta B decided many of the subsidiary cases, subsidiary issues in that case, they haven't, the plaintiffs haven't, and fine, give the district court a pass because he didn't have Binta B, but the plaintiffs have never come forward and said, this is the provision of the remedial order that it's necessary, that we're trying to enforce. On the second part of the Binta B test, I've already got the work didn't result in the relief. Point number two on the second part of the Binta B test, none of the relief that came out of the fine money orders was directed against the state. And in that regard, Your Honor, I do want to direct the court's attention to a case that was not cited in the briefs but that I think is directly on point on this. In Kentucky v. Graham in its 473 U.S. 159 at page 164, the Supreme Court held that under 1988, only the party legally responsible for the relief on the merits may be required to pay fees under section 1988. The state was not legally responsible for the relief granted in the fine money orders. That money came from the United States. There was no relief entered against the state in the fine money orders, and on that ground alone, you can reverse. Isn't the test whether they obtained relief for their client and not so much whom it was extracted from? It's both, Judge Kethledge. That's what Kentucky v. Graham held. In that case, there were multiple parties in the case. It was a case, and I apologize, my light's on, but let me finish my answer. It was a case where it had been brought against both the state and some troopers, I think, for a Fourth Amendment violation. Liability was only imposed against the troopers, yet this court held that the state could be liable for the 1988 fees even though the relief, which the plaintiffs indisputably got, had not come from the state, and the Supreme Court squarely held that only the party legally responsible for the relief on the merits can be hit for 1988 fees. To the extent you think that this relief is otherwise eligible, the relief from the fine money orders, it fails on that ground because it didn't come from the state. I know your time is up. I have one more question, unless you have a follow-up. No, please. Before Binta B, wasn't the law in this circuit that you could recover for monitoring activity? Is that true or not? It's basically true. Then in Binta B, isn't it also true that the court didn't decide the extent to which monitoring compliance is compensable? Is that true? The court was schizophrenic. They dropped the footnotes saying that they were not addressing it, yet at least one of their rulings did go to something that was monitoring. But let me go to your underlying question. What that does is sort of leave at least, it's a small part of what you're challenging, but at least that part, it seems to be under our precedence, was legitimate. Let me explain why that's wrong, Judge Rogers. While Binta B did not, if you take the footnote at its face, that it was not deciding monitoring, and you ignore the… It kind of says that. It does say that. My only point is, later in the opinion, they specifically held that work done to look at individual cases to see if the state is properly complying with the consent decree. They vacated that relief, and that's exactly what the monitoring work is in this case. But let me take your premise, notwithstanding that ambiguity. We can just read those two and see which one is operative. Is that if it's schizophrenic, we just figure out which one they meant, right? Well, I think you have to take, ultimately, what they held, which was that certain work was not compensable. But let me assume I'm wrong about that, and the footnote is what controls. You can still get to this, and here's why. The prior circuit precedent is the Haddox case from the late 1990s that the plaintiffs rely on and the Delaware Valley case. Even though Binta B didn't address monitoring, it did address the impact of those two precedents, and it held that in the wake of the Buchanan case, that those precedents had been limited. And it basically held that in Delaware Valley, monitoring was authorized by the Supreme Court, but it led to a subsequent order granting relief. I think that was the same as true in Haddox. In this case, the small little bit of monitoring we have did not lead to any new relief. So, Judge Rogers, I would say you're no more bound by Haddox and Delaware Valley than Binta B was. You're in exactly the same shoes the Binta B panel was in, and you should reach the same result they reached, which was that Haddox and Delaware Valley are now limited by the subsequent Supreme Court decision in Buchanan, and the limitation is simply this, that any monitoring work must lead to some kind of order providing relief. That's what Binta B held, and that's what I'd urge you to hold here. And if I could retain my rebuttal. Yes, you have your rebuttal. Thank you so much, Judge Rogers. Good morning. Good morning. I'm Earl Schwarz of the Memphis Bar, and I am one of the attorneys that has been representing People First since this case made it to the Western District of Tennessee in 1992. Have you been with it since 1992? I have, Your Honor. Wow. And in addition, Your Honor may remember from earlier arguments in this case Judy Grand, who was formerly with the Public Interest Law Center, now in private practice, and Mr. Jack Derryberry, who is in private practice in Nashville, Tennessee, and both of those lawyers have been with this case before me since this case was originally filed in Nashville, Tennessee. Life's work, more or less. It has been a portion of our life's work. I was exaggerating. I know you've done a lot of other things as well. Well, the point is that we are extremely proud of the work that we have done in this case. We are extremely proud with the results that we helped achieve. As Judge Rogers knows, this case developed from virtually a nascent community system with most of the class members living in Arlington in the institution, confined in an institution, into a system, a robust system of community supports and services that the court has now determined is sustainable and creates a sustainable remedy for those who were in the institution and at risk of being institutionalized. I think everybody would agree that's highly laudable, but the questions before us this morning, I would suggest, are a lot more specific than this level. Certainly, Your Honor. In terms of whether, you know, under Ben-to-be, all of the award is recoverable. And we believe that it is. We believe that Judge McCullough, as Judge Kethledge, as Your Honor correctly pointed out, this case sort of arrives at the Sixth Circuit in a bit of a procedural never-never land because below, the state of Tennessee argued only one thing as a matter of law, which is whether or not People First was a prevailing party for purposes of receiving fees. I mean, they're allowed to argue the intervening precedent which they have. And may I address that? The Ben-to-be, so we believe that Judge McCullough correctly anticipated Ben-to-be, but if the court believes otherwise, then I think that, correct, it needs to be remanded and let Judge McCullough have a chance to take a crack at it on these facts. But we believe Judge McCullough correctly anticipated Ben-to-be because what the overarching teaching of Ben-to-be is that how do we create a mechanism for objectively determining whether the work for which payment is sought has value in the context of the litigation. But the court did create that mechanism, and the result is a pretty specific test. And it is not the test. I'm sorry, Your Honor. That's okay. We're bound to apply. And it is not the test that Mr. Kirk cited to you. The test of Ben-to-be does not contain a causal relationship in the sense that you and Mr. Kirk discussed. What Ben-to-be requires, once prevailing party status is determined, what it requires is that an action by the plaintiff to defend or enforce a prior consent decree must be necessary to enforce the prior order. And result in a subsequent court order or agency determination that at the very least secures plaintiff's initial success in obtaining the consent decree. At the very least secures plaintiff's initial success in obtaining the original decree. The results is in there, too. The original decree. Mr. Kirk wants to translate that to mean that there has to be an order that finds that the state is in contempt. That results in a subsequent court order. Yes. And here we have the two orders that we have argued and that Your Honor has recognized. How were the fine orders connected when the motion was dismissed? My same question. I'm sorry. No, that's right. How were the fine orders connected when the district court dismissed the contempt motion and as opposing counsel points out, the motion was not renewed? That leads to a fight to the death mentality. That's a policy argument. Let's start with the record-based answer. How did the contempt motion result in all of the work, frankly, in the contempt motion, which covered a lot of different allegations? How did that all result in these two orders? Well, there is, in fact, an actual causal connection because the time records clearly reflect that these discussions occurred, these settlement discussions regarding the fine money order and the cis order, all occurred in the aftermath of the recessing of the contempt proceeding as recognized on the record for the purpose of settlement discussions. So there is a temporal straight line. But there is also, if I may be permitted to read from the cis order, which addresses directly this whole issue of, as alleged in the contempt proceeding, the improper use of the ICAP to restrict the delivery of services to class members. And what the parties recognize and what's incorporated in the court's order on the cis is, if I may, the ICAP, which is under attack in the contempt proceeding, the ICAP is one of the generally accepted assessment tools available to states. However, it is a deficit-driven tool that outlines a person's needs by determining what the person cannot do. The ICAP does not promote person-centered thinking or planning discussions about determining specific day-to-day supports that might be needed. Another assessment tool is a cis. The cis is a support-driven assessment, meaning it focuses on the supports needed by persons to live an everyday life integrated into the community. The cis promotes person-centered rather than program-centered thinking. It emphasizes exploring the full range of typical life activities. In continuing, the cis has a strong translation to plan writing and is very helpful to discussions of person-centered goals and the development of natural supports. In sum, the ICAP outlines a person's deficits, while the cis focuses on the supports needed by persons to achieve a full life in the community. That's what the orders, the consent order, I mean, the community plan, the remedial order, the 2006 settlement agreement, that was the focus. Well, I mean, but the question is how did some of this work that you did with respect to the content motion, which frankly has nothing to do with what you just read. I mean, in terms of you weren't arguing for a new measuring tool. A lot of the work had nothing to do with a new measuring tool. That's fair, isn't it? A lot of the time records that are in this case reflect that there was a substantial amount of discovery devoted to learning how the ICAP was being used. Okay, but I mean, I guess I feel like I'm taking a deposition here. I'm sorry if I'm not answering your question. You're doing fine. There is, granted, I understand your argument that some of your work related to this tool, and you can point to, you know, we did discovery, we did that, time records, this. My question is there seems to be a lot of work relative to the content motion compensated by the district court which doesn't relate to subsidies, to the tool, et cetera. And my question, I just want to be candid with you about my concern. My question is how does that work, apparently unrelated, meet the results in, et cetera, test of been to be? In all due respect, General, we don't believe that work was unrelated. That work, we had four or five days of hearings in the district court as to all of the problems that were created by the state of Tennessee when in 2007 they announced a unilateral reduction in rates and so forth and so on. And so the work contributed to the results obtained, which was moving to a new assessment tool, which was addressing the state's reduction of housing subsidies, which was addressing the state's failure to create a housing policy, which, by the way, they did on the eve of the contempt proceeding. And so this is a system reform case, and Haddox v. Johnson is precisely on point, and it is, I agree, controlling authority. It was an institutional reform case. This is an institutional and system reform case where everything that was done, including this litigation of the contempt motion, contributed to the final result, contributed to the system, and is enshrined now in the exit plan in the court's dismissal of the case. So the litigation is organic. The litigation is organic. What happens in one place affects what happens in other places. I guess my question, does everything affect it? Is everything necessary? I mean, if so, then once you're a prevailing party and you get some additional order down the road, I mean, you get paid for everything, which I don't think that's the law. That moves us to the lodestar analysis, Your Honor. That's where the inquiry is. How much of once you determine that under Binti B that the work had value, then you move to the lodestar calculation, which was not disturbed by Binti B, and that's where the court determines how much value. In this case, Judge McCullough determined that there were certain hours that should not be included in the lodestar, and then Judge McCullough determined correctly, we submit, that there should be no reduction in the award because he found, as a matter of fact, that the work contributed full value. So the analysis that Your Honor is, I believe, focusing on is the portion of the lodestar calculation where you determine how much of the time actually contributed to the result. Yeah, I mean, I guess that's one way of looking at it, how much of this work was necessary to enforce the prior order, or how much of this work resulted in a subsequent order that secured the initial success. Yes, and Judge McCullough has determined that the work was necessary. Judge McCullough, here, as he says at page 21605, here, Prupl's first contempt motion sought to enforce provisions of the court's remedial orders. Prupl's first work on the contempt proceedings and securing changes to class member services through the consent orders is directly related to the original proceeding in this matter. And then he goes on to say, both class member housing and service assessments were at issue in Prupl's first motion for contempt. The parties reached agreement on these issues. This is at 21603. The court sanctioned these changes to its consent orders, and Prupl's first efforts resulted in improved housing and assessment services for class members. Then Judge McCullough goes on to say, the consent orders that resulted from the contempt proceedings did not address all of the issues presented by Prupl's first and his contempt motions. The orders, however, resulted in significant benefits to the class members. For these reasons, the court declines to reduce the lodestar amount. If I'm understanding you correctly, your basic point is that bent to be doesn't really have a causation requirement. It just has a related to requirement. Is that fair? It doesn't have a causation requirement in the sense that I believe this court is asking about. What bent to be, again, the overarching teaching of bent to be, I believe, is set out where the court first identifies the task before it. At page 621 of the published opinion, where the court says, do they have to establish again that they are a prevailing party, or alternatively, only be required to show that work was otherwise compensable because it was in some way spent defending the earlier work. The holding is on page 625, and whether we call it a causation requirement, we could just call it a result in requirement. I mean, that's what the court said, and those words mean something. Indeed. You have to apply. No, go ahead. I keep interrupting you, Judge. No, not at all, sir. I apologize. And the resulting requirement is, well, first, it's necessary to enforce and result in a subsequent order that, at the very least, secures plaintiff's initial success in obtaining the original decree. And we submit that these orders did secure the plaintiff's initial success, which was to create a vibrant community system for persons in the institution and moving out of the institution. Well, I mean, that's limitless, isn't it? What you just said would be limitless, and it goes back to Judge Kethledge's point that once you prevail on the merits initially, then anything that you do is going to be compensable. That's not the law, is it? Nor was that what I intended to say, Your Honor. If I said that, I apologize. Well, I was looking for the limitation on what you said. The limitation continues to be. The limitation continues to be, undervent to be, whether the work was necessary to enforce the decree. Let's suppose, hypothetically, that we had filed, that the state hadn't made all these policy changes, we hadn't done all the due diligence to meet with class members and parents and so forth. It is very difficult for me to recreate in this chamber the chaos that ensued from what happened in the system, from what happened in 2008. But let's assume that we had simply filed some transient motion asking that Mr. Kirk be required to wear green ties in this case. Well, no. That wouldn't be necessary. That wouldn't be an action necessary to enforce the prior consent decree, and it would have no bearing on the relief originally obtained. But I don't believe that one can characterize the contempt proceeding as that type of action. But, I mean, the bend-to-be test is a lot more rigorous than a green-tie test. Right? The bend-to-be test, the bend-to-be, it is. And we believe that Judge McCullough correctly anticipated that in the findings that I have read to you. What if during that time, instead of worrying about the green tie, you decided to research another issue that you might add on to further the type of relief that you've been obtaining over the last 20 years, and you spent, you know, hundreds of hours researching it and come to the conclusion it's a non-starter? Can you get recovery for that? I would argue, to your honor, no. Why not? It's kind of related, you know?  It would, had we come forward on the basis of that research and done something affirmative in the case, then perhaps. Did something affirmative, let's say, and the court threw it out. If we had brought an unsuccessful motion that had nothing to do with the original decree, then I would say that we would not be entitled. When you say nothing to do, that's a little bit ambiguous. I mean, it has something to do with it. It's seeking the same kind of relief, and your original argument that it was unsuccessful is that it's, I don't know, required by something under the decree. If what your honor is trying to move to is the discussion meant to be about general monitoring work and what your honor has already observed. No, it isn't really. I'm trying to get at this issue that my colleagues are getting at as to where the limit is, and to come up with a limit that will never happen is another way of saying it's unlimited. So that's why I'm trying to come up with some kind of hypothetical, analogous to things I see when I review vouchers for lawyers' fees. Sometimes they do things that are just, let's look into this, and then they charge for it. If that's included within your interpretation of meant to be, that's a much broader interpretation than something which leads to a successful result, which you're saying is not the standard, right? Leads to something which either keeps the original decree from being lessened or adds to the relief that the initial decree provided. I thought that was the strict causation of additional relief test that you're rejecting, that you're saying meant to be does not require. Am I missing something? I may not be articulating my thoughts very well. First of all, one would never find that in this case. We exercise substantial billing judgment. Second of all, the second requirement of meant to be that results in a subsequent order that at the very least secures plaintiff's initial success, the research to which Your Honor referred would not do that. Would not do that. Would not do that. How is that any different, say, from a whole bunch of contempt allegations that went nowhere, really? That just sort of there was no judicial action ever in response to them other than, yeah, there were a couple of orders later, but they really had nothing to do with these two allegations specifically. Why isn't that like a dead-end research project? Because it didn't go nowhere. It resulted not only in two orders, but it also resulted in... Well, that begs the question, though. That's kind of what we're struggling with. There are a lot of allegations in the contempt motion that on their face just don't have any connection with an assessment tool or with housing subsidies. I mean, I understand some of your allegations do, but a lot of them have nothing to do with that. But the result under Binta B is a subsequent order that secures the plaintiff's initial success in obtaining... But how do we know that that additional... We're not doing this in gross. Let me put it that way. Okay, you've got a lot of contempt work. We're not determining in gross, necessarily, whether that led to the orders. We have to say, well, you know, what about all this area here that doesn't seem to have a connection with that specific relief? How did that result in relief that seems unrelated? That's what we're struggling with. And maybe is your answer simply that the contempt motion as a whole was a hammer that brought them to the table and somehow two years later the result was these orders? Is that a fair characterization of your argument? Only partially, Your Honor. Okay. I mean, what am I missing? And I didn't mean to be... No, not at all. No, I mean, we're trying to, you know, understand... So the contempt proceedings was directed at a number of different things, and the State of Tennessee made changes while that contempt motion was proceeding. Buckhannon's a problem for you on that theory. I don't believe so, Your Honor. May I speak to that? My time is up. Yes. Buckhannon, it's... First of all, Buckhannon was a prevailing party analysis, and I think it is risky to transport prevailing party analysis into the second phase, in the second part of Bentobee's test. But Buckhannon merely said that, yes, it did away with the catalyst theory that had heretofore been accepted, but as subsequent courts have recognized, number one, it did it in a pre-litigation context, and number two, it did not do it in an institutional reform case where there has been a relationship between counsel and the state to try to build a system, to try to build a system, much like Haddox v. Johnson. But if your answer is that this work, this other kind of work that I'm talking about, resulted in just sort of general benefits for the class, that's a different answer than these two orders support the award. That's not a reason why those two orders support the award. It's just a different reason altogether. Well, Your Honor, I don't have to show a connection between this work and these two orders because the class otherwise benefited, apart from those two orders, from the work. Is that what you're arguing? Well, that's part of it, Your Honor, but again, I may not be making this clear. I think determining the value of the work is in the lodestar category. I just don't see it as a lodestar issue. It's whether, I mean, a lodestar issue is, I don't know. I mean, I don't know how else to express it. And I'm sorry if I'm not communicating. No, it's all right. Effectively, I suppose the best way I could say it is that the risk in the Bent to Be case of a subsequent order is precisely what happened here, that is, which the defendants can game the system. Mr. Kirk correctly pointed out that there's nothing in either of these orders that ties them directly to the consent proceeding, but that's not because we didn't try. The record reflects that we submitted language that the state of Tennessee rejected, and then we had a Hobbesian choice. Do we eschew the relief because the state won't put the language in the order? I think not.  And so I think we need to be very careful in terms of policy. If you eschewed the relief, you wouldn't get the attorney's fees either. I'm sorry? I don't see how eschewing the relief would cause you to gain the attorney's fees. No, they wouldn't. We would violate our duties to the class. We would violate our duties to the court who appointed us as class counsel, and we would. And that's a real tension in a lot of circumstances where the issue of the attorney fees and the relief on the merits become one big rubber band ball, right? And it's very difficult for counsel in your position to work that out. Am I right about that? It is difficult for us to insist that certain language be put in an order when the response is, no, we're not going to put it in the order, and, of course, the result would be you don't get the relief. No, I mean, oh, yeah, yeah, no, that's true. But, I mean, the answer, it would seem, to this problem is the district court, at the end of the day, is going to make its own determination whether your work leads to certain relief. And just because, you know, it's not going to depend on them consenting to some language that says that. The district court is going to make up its own mind. And Judge McCullough was in, of course, the correct position to do that, and Judge McCullough made that determination, as I have said to the court several times over. He made the determination that the work had value and that it contributed to the benefits that the class received. And in doing so, he did not reduce the Lodestar calculation. It made the result that he shouldn't. One more question. I'll give you a chance to respond to counsel's argument regarding Kentucky v. Graham. I don't know if you heard that citation for the first time.  I did. Okay, all right. And I would, I mean, if I can, with the leave of the presiding judge, it's an important point. You didn't know about it coming in. If you'd like to submit a, you know, a couple-page letter in response, in your view. I mean, I understand the argument is that Kentucky v. Graham, I don't know. I have it in the back page here. I don't remember exactly. State not legally responsible. That's right. The relief has to be extracted from the state in order for you to be able to get fees under Section 1988, I believe was the argument. So if you want to read the case and just give us your view. Sure, but let me not step down. If I may have just one second to respond. Judge Rogers. Yes. The state was required to undertake certain things in these orders. We did get obtained, in that sense, relief from the state. The state was required to implement the SIS. The order is very clear as to what the state's obligations are there. Does that help? Do you want three pages enough for you? That's more than enough. No more than three pages, no more than ten days. How about that? Ten days from today? This is your view on Kentucky v. Graham. All right, thank you. Thank you, counsel. Thanks. Judge Kepledge, I would submit that your approach to analyzing what's before you in terms of what were the allegations in the contempt motion is exactly correct. I would start your review of that on pages two and three of the district court's opinion under review, where Judge McCollough listed the six major issues that were at issue in the contempt motion. And you'll see that there were things like complaints about the reduction in provider reimbursement and eligibility requirements, all things that had absolutely nothing to do with housing or the tool. So the six major issues plainly do not satisfy bin to be, because even if they had shown that those were necessary to enforce the agreement, the underlying relief, complaining about those issues, there's no subsequent order. So what you're left with are the two complaints that you started out with in questioning me, Your Honor, the housing and the change in the tool. Before we get to that point specifically, let me just ask you, I mean, as Mr. Schwartz read, I mean, the district court did say that sort of all this work was related to the original decree, and I forget the exact language, but essentially resulted in significant benefits, which presumably one could relate back to the remedial order for the class. Let me go to exactly what Judge McCollough said. He did not say that all of this work was related back to original relief. He never said that at all. He did say that the orders provided significant benefits in the form of the housing subsidy and the change to the SIS tool. But providing significant benefits to the class isn't enough. Bin to be was very clear about that. You have to meet that clear test. In terms of whether he found that the work related to all of the allegations in the contempt decree, he squarely acknowledged that some of the allegations in the contempt motion were not covered by the relief orders, and he simply refused to reduce the load star to account for that. What about the idea that, I don't remember if he said this, but the idea that, hey, this contempt motion was just a big hammer that related specifically to the later orders or not. That was a hammer that drove negotiations, which in turn results in those two orders. He didn't say it was a big hammer. He did say he thought there was some relation, and I would submit that that's clearly erroneous. There is nothing in this record that supports the proposition that the one thing led to the other. What is in this record directly refutes it. What refutes it? The fact that the orders say nothing at all about the contempt motions, the fact that the orders did not release the state from the contempt motions, such that they were not resolved, and because they'd been dismissed without prejudice, they could have been brought back the next day. If the state entered these agreed orders solely to get out from underneath the contempt motions, surely it would have insisted that those motions be resolved with prejudice in this order, and we did not. Your Honor . . . Given the fact that Binta B. tightens the acuity of the analysis needed to be done by the district judge, I appreciate your assertion that there's no questions of fact here, but given the fact that the acuity of the analysis based on Binta B. has got to be a lot tighter than on previous cases, why shouldn't we send this back to Judge McCollough to give him another opportunity to apply Binta B. to this particular situation? My best answer to that, Your Honor, besides the absence of factual questions, is the fact that that's not what Binta B. did. Binta B. actually applied the test to the record that was before the court. I do want to briefly touch on my backup argument because it is important, and Judge Kethledge, your question started to go to that. If the court decides not to reverse on any of the grounds, the four grounds I've got, that they haven't shown it was necessary to enforce, the order didn't result from the work done, the Kentucky v. Graham order, which by the way is briefed on pages 32 and 33 of our brief, that the relief was not directed against the state. So the only thing new here is we did cite the case this morning, and that wasn't cited in our brief. And number four, the second requirement of prong two of Binta B. is that the relief must be, in the order, must be at least secure the original relief received. Here, they've not shown any original provision of any of the remedial orders in 20 years of this litigation that in any way went to the housing foundation or the SIS tool. But, I mean, is that too demanding now, a level of generality or specificity? I mean, do we have to look for the words, you know, housing in the remedial order or something, or tool in order to say that, yeah, these later orders did in some significant sense secure the initial success? I think you do, Judge Kathledge, but you certainly need more than it was a benefit to the class. Because Binta B. squarely rejected that. Because they cited things that were benefits to the class, and they said that's not good enough. Theoretically, let's say the remedial order states some benefit at a significantly higher level of generality, and these two orders, the specific benefits in those orders, arguably fall within that level of generality, and now we have to defer to the district court. I mean, there's obviously a spectrum here. Benefit to plaintiffs isn't good enough. And I would say it doesn't have to be, you know, provide rental assistance in this particular manner. I would accept some level of generality. But here they pointed to nothing. They pointed to nothing. I would respectfully request that you reverse on any of the foregrounds we've given. If you think that there's still something to be done on remand, I would respectfully request that your remand instructions make it clear that only work done on the tool and on the housing is compensable. Because the fact of the matter is the state's taxpayers will get 95% of the benefit of this if it's limited to those issues. Because most of the work was done on all these other issues. Thank you, Counsel. Thank you, Your Honor. Go ahead. Thank you. Case will be submitted. Thank you, Counsel.